

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ELIZA DIACONESCU | No. **1:22-cr-00353**<br>**Judge Gary Feinerman**<br>**Magistrate Judge Maria Valdez**<br><br>Violation: Title 18, United States Code, Section 1347 |

The UNITED STATES ATTORNEY charges:

1. At times material to this Information:

    a. Defendant ELIZA DIACONESCU was a physician licensed to practice medicine in Illinois, had a Drug Enforcement Administration ("DEA") Registration Number authorizing her to prescribe controlled substances, and was enrolled as a Medicare provider. DIACONESCU treated patients, including Medicare beneficiaries, at Clinic A, a pain management clinic located in Gurnee, Illinois, that was owned by DIACONESCU.

    b. Office Employee A worked at Clinic A.

    c. In or around March 2018, the Illinois Department of Financial and Professional Regulation placed DIACONESCU on a three-year period of probation for prescribing controlled substances that were not medically necessary.

*Prescriptions for Schedule II Controlled Substances*

    d. The Controlled Substances Act, Title 21, United States Code, Section 801, *et seq.*, and its implementing regulations (collectively, "CSA") set forth which drugs and other substances were defined by law as "controlled substances." A Schedule II controlled substance was a drug or other substance that had a high

1

potential for abuse, and abuse of which may lead to severe psychological or physical dependence. Schedule II controlled substances could be dispensed only with a written prescription issued by a licensed and registered practitioner. 21 U.S.C. § 829(a). The CSA further required that all prescriptions for controlled substances be dated as of, and signed on, the day when issued; prohibited refills of prescriptions for Schedule II controlled substances; and restricted a provider's ability to issue multiple prescriptions authorizing a patient to receive a Schedule II controlled substance. 21 C.F.R. §§ 1306.05(a) and 1306.12(a); 21 U.S.C. § 829(a).

  e. Hydrocodone, oxycodone, and fentanyl were Schedule II controlled substances. 21 C.F.R. §§ 1308.12(b)(1)(vi), (b)(1)(xiii), and (c)(9).

*Medicare*

  f. The Medicare Program was a federal health care benefit program, as defined in Title 18, United States Code, Section 24(b), that provided free or below cost health care benefits to certain eligible beneficiaries, primarily individuals who were over the age of 65 or disabled. Enrolled providers of medical services to Medicare recipients were eligible for reimbursement for covered medical services. By becoming a participating provider in Medicare, enrolled providers agreed to abide by the rules, regulations, policies, and procedures governing reimbursement.

  g. Medicare utilized the American Medical Association ("AMA") Physicians Current Procedural Terminology ("CPT") system, which was published in the AMA Current Procedural Terminology Manual ("CPT Manual"), for the coding of medical services. Providers identified the medical services provided to patients by

using CPT codes on bills submitted to Medicare. Medicare used the CPT codes to determine what, if any, amount would be reimbursed to the provider.

        h.     CPT Codes 99212, 99213, and 99214 covered the treatment of an existing patient and entailed a visit between the provider and the existing patient.

        i.     Medicare paid for covered services for which a representation had been made that the services were actually provided to patients on the dates of service.

        2.     Beginning no later than September 2016, and continuing until in or around June 2021, at Gurnee, in the Northern District of Illinois, Eastern Division, and elsewhere,

ELIZA DIACONESCU,

defendant herein, along with Office Employee A and others, participated in a scheme to defraud a health care benefit program, namely Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of Medicare, in connection with the delivery of and payment for health care benefits and services, which scheme is further described below.

        3.     It was part of the scheme that, in connection with DIACONESCU's provision of prescriptions for Schedule II controlled substances to patients, DIACONESCU knowingly submitted false claims seeking reimbursement from Medicare for purported visits with patients at Clinic A, knowing that such visits did not occur.

4. It was further part of the scheme that DIACONESCU fraudulently pre-signed blank prescriptions for hydrocodone, oxycodone, and fentanyl for existing patients of Clinic A so that the prescriptions could be provided to the patients when DIACONESCU was not at Clinic A.

5. It was further part of the scheme that, at DIACONESCU's direction, Office Employee A and others completed the pre-signed blank prescriptions by writing in Schedule II controlled substances, including hydrocodone, oxycodone, and fentanyl, adding the patient's name, and adding the date on which the patient came to Clinic A to pick up the prescription.

6. It was further part of the scheme that, with DIACONESCU's knowledge, patients picked up the pre-signed prescriptions for Schedule II controlled substances from Office Employee A and others at Clinic A without having a contemporaneous examination with DIACONESCU.

7. It was further part of the scheme that DIACONESCU instructed Office Employee A and other staff at Clinic A to bill Medicare for patient visits pursuant to CPT Codes 99212, 99213, and 99214, when, as DIACONESCU knew, she did not have visits with the patients.

8. It was further part of the scheme that DIACONESCU, Office Employee A, and others created and caused to be created false paperwork indicating that DIACONESCU had face-to-face examinations with patients when, in fact, the patients had come only to pick up the pre-signed prescriptions for Schedule II controlled substances, and had not in fact had face-to-face visits with DIACONESCU.

9. It was further part of the scheme that, for at least 80 Medicare beneficiaries, DIACONESCU pre-signed prescriptions for oxycodone, hydrocodone, and fentanyl that were provided by staff of Clinic A to the beneficiaries while DIACONESCU was traveling outside the state of Illinois. DIACONESCU then knowingly caused Medicare to pay for purported patient visits that did not occur for those beneficiaries.

10. It was further part of the scheme that DIACONESCU deposited, and caused to be deposited, the money she fraudulently obtained from Medicare as a result of the scheme into a bank account that DIACONESCU controlled.

11. It was further part of the scheme that DIACONESCU misrepresented, concealed and hid, and caused to be misrepresented, concealed, and hidden the purpose of, and acts done in furtherance of, the scheme.

12. On or about June 15, 2021, at Gurnee, in the Northern District of Illinois, Eastern Division, and elsewhere,

ELIZA DIACONESCU,

defendant herein, did knowingly and willfully execute and attempt to execute the above-described scheme by submitting and causing to be submitted to Medicare a claim for reimbursement for health care services purportedly provided to Patient V.T. on or about June 3, 2021, that were not actually provided;

In violation of Title 18, United States Code, Section 1347.

/s/ John R. Lausch, Jr., by TCM
UNITED STATES ATTORNEY